# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

NATASHA H.,

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

No. 25-cv-2003-CJW

**REPORT AND
RECOMMENDATION**

_____

Natasha H. ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") in denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. For the reasons that follow, I recommend that the Commissioner's decision be affirmed in part and reversed and remanded in part.

## I.     BACKGROUND

Claimant was born in 1986. (AR[1] at 168.) She is a high school graduate and attended two years of college. (_Id_. at 188.) Claimant allegedly became disabled due to a herniated disc in her neck, depression, and anxiety. (_Id_. at 187.) Claimant's onset of disability date is November 1, 2021. (_Id_. at 168.) On May 11, 2022, Claimant protectively filed her application for DIB. (_Id_. at 14, 165.) Her claim was denied originally on August 22, 2023 (_id_. at 14, 80-87) and was denied on reconsideration on April 4, 2023. (_Id_. at 14, 88-97.) A hearing was held on October 18, 2023, with

---

[1] "AR" cites refer to pages in the Administrative Record.

Case 6:25-cv-02003-CJW-MAR    Document 14    Filed 03/05/26    Page 1 of 28

Claimant and her attorney Hugh Field appearing by online video before Administrative Law Judge ("ALJ") Kim Fields. (*Id*. at 45-79.) Vocational Expert ("VE") Jeff Johnson also appeared at the hearing telephonically. (*Id*.) Claimant and the VE both testified at the hearing. The ALJ issued an unfavorable decision on January 23, 2024. (*Id*. at 14-36.)

Claimant requested review and the Appeals Council denied review on November 20, 2024. (*Id*. at 1-4.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On January 17, 2025, Claimant timely filed her Complaint in this Court. (Doc. 4.) On May 30, 2025, all briefing was completed, and the Honorable C.J. Williams, Chief United States District Court Judge, referred the case to me for a Report and Recommendation.

## II. *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant has a disability when, due to physical or mental impairments, the claimant:

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work,

lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability, the Commissioner follows a five-step sequential evaluation process. *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 404.1572(a)-(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 404.1520(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 404.1520(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also* 20 C.F.R. § 404.1521(b). These include:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to

supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). RFC is the most an individual can do despite the combined effect of all his or her credible limitations. *Id.* § 404.1545(a); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b)(1). If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), 404.1560(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work

4

exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A. The ALJ's Findings

The ALJ made the following findings regarding Claimant's disability status at each step of the five-step process. Initially, the ALJ determined that Claimant met the insured status requirements through September 30, 2025. (AR at 16.) The ALJ then applied the first step of the analysis and determined that Claimant had not engaged in substantial gainful activity from her alleged onset date of November 1, 2021. (*Id.*) At the second step, the ALJ concluded from the medical evidence that Claimant suffered from the following severe impairments: fibromyalgia, disorders of the spine resulting in compromise of a nerve root, and obesity. (*Id.* at 17.) At the third step, the ALJ found that Claimant did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.* at 19.) The ALJ evaluated Claimant's claim under listing 1.15 (disorders of the spine). (*Id.*) At the fourth step, the ALJ determined that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) except that she can occasionally reach overhead and in all directions with the right upper extremity.

(*Id.* at 20.) Also at the fourth step, the ALJ determined that Claimant was unable to perform her past relevant work. (*Id.* at 34.) At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy Claimant could perform, including call out operator, school bus monitor, and children's attendant. (*Id.* at 35.) Thus, the ALJ concluded that Claimant was not disabled. (*Id.* at 36.)

## B. The Substantial Evidence Standard

The ALJ's decision must be affirmed "if it is supported by substantial evidence in the record as a whole." *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021) (quoting

*Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted); *see also Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) ("Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.") (Quoting *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012)). Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). "An ALJ's decision is 'not outside the zone of choice' simply because [the c]ourt 'might have reached a different conclusion had [it] been the initial finder of fact.'" *Kraus*, 988 F.3d at 1024 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers "both evidence that detracts from the Commissioner's decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). However, "even if inconsistent conclusions may be drawn from the evidence, the [Commissioner's] decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *see also Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (providing

that a court "may not reverse simply because [it] would have reached a different conclusion than the [Commissioner] or because substantial evidence supports a contrary conclusion").

## III.    DISCUSSION

Claimant alleges that the ALJ committed reversible error by (A) failing to fully and fairly develop the record on isolated jobs issues (call out operator and children's attendant) and failing to properly follow SSR 00-4p with regard to the school bus monitor job; and (B) failing to properly evaluate the opinions of Casey Doyle, PT.  (Doc. 9.)

### A.    Jobs Issues

#### 1.    Parties' Arguments

Claimant argues that:

> The vocational expert only identified 1,977 call out operator jobs nationally and 900 children's attendant jobs nationally as available in response to the ALJ's hypothetical question that became the RFC, and the ALJ relied on the testimony to [Claimant] benefits. . . .  The ALJ did not clarify whether these were isolated jobs given the sparse number identified. . . .  These low numbers require remand for clarification as to whether the call out operator and children's attendant jobs are isolated job, given the lack of identification of jobs in the state or region provide.

(Doc. 9 at 21.)  Claimant also argues that "[w]ork that is only available part-time cannot be relied on to deny a claim."  (*Id.* at 25.)  Claimant points out that "[a] school bus monitor job involves the transportation of children to and from school" and "would not be expected to be in operation for eight hours of a school day."  (*Id.* at 26.)  Claimant maintains that "[t]he job title and description of duties makes it apparent this is part-time work, which was an apparent conflict with the vocational expert's testimony that was neither recognized nor explained, resulting in that job and the numbers identified not amounting to substantial evidence to deny [Claimant's] claim."  (*Id.*)

7

The Commissioner argues that:

> Because the occupations identified in this case collectively exceed 10,000 jobs nationally (specifically, 1,977 call-out operator jobs; 10,230 bus monitor jobs; and 900 children's attendant jobs nationally), . . . and because the vocational expert testified that these were merely "samples" of available occupations . . .—i.e., not an exhaustive list—the ALJ appropriately found that the jobs identified existed in significant numbers in the national economy. Thus, the Court should reject Plaintiff's assertion of reversible error on this issue.

(Doc. 11 at 11.) The Commissioner also argues that Claimant "concedes that the Eighth Circuit Court of Appeals has held that a VE is not required to articulate the percentage of available jobs that were part-time or full-time where there is otherwise no reason to think a job is only available on a part-time basis." (*Id.*) (citing Doc. 9 at 26, in turn citing *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010)). The Commissioner also asserts that Claimant "has presented no credible evidence that the bus monitor position is performed part-time." (*Id.* at 13.)

### 2. Relevant Law

"The claimant has the burden of proof to show she is disabled through step four; at step five, the burden shifts to the Commissioner to show there are other available jobs in the economy." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir.2004)). At the fifth step of the sequential evaluation process, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). Under the regulations, "work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the county" and it does not matter whether: "(1) [w]ork exists in the immediate area in which you live; (2) [a] specific job vacancy exists for you; or (3) [y]ou would be hired

if you applied for work." 20 C.F.R. § 404.1566(a); *see also* 42 U.S.C. § 423(d)(2)(A) (providing that "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country"). The regulations further state that:

> Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy." We will not deny you disability benefits on the basis of the existence of these kinds of jobs. If work that you can do does not exist in the national economy, we will determine that you are disabled. However, if work that you can do does exist in the national economy, we will determine that you are not disabled.

*Id*. § 404.1566(b).

In *Jenkins v. Bowen*, 861 F.2d 1083 (8th Cir. 1988), the Eighth Circuit Court of Appeals addressed the issue of what constitutes a "significant number of jobs." The Eighth Circuit identified the following criteria for determining whether work exists in significant numbers, including "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id*. at 1087 (quoting *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)). Applying these criteria, the Eighth Circuit found that:

> Here [the claimant] has unique skills, has twenty-five years experience as a security guard and is well-qualified to do the sedentary security jobs described by the vocational expert. Accepting [the claimant's] contention that only 500 jobs are available to her, we nevertheless believe that this number represents a significant number under these circumstances.

*Id.*; *see also Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (finding 200 jobs in Iowa and 10,000 jobs in the national economy constituted a significant number of jobs); *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997) (finding 650 jobs in Iowa and 30,000 nationwide constituted a significant number of jobs); *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997) (finding the portion of cashier (5,227 jobs) and receptionist (1,045 jobs) jobs that would accommodate the claimant's impairments combined with 218 order clerk and 122 information clerk jobs that the claimant could also perform constituted a significant number of jobs); *Weiler v. Apfel*, 179 F.3d 1107, 1111 (8th Cir. 1999) (finding 32,000 jobs nationwide constituted a significant number of jobs); *Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003) (finding 10,000 jobs in Missouri constituted a significant number of jobs).

In *Karen E. v. Kijakazi*, this Court addressed the phase "work which exists in the national economy" as follows:

> The phrase "work which exists in the national economy," however, is a term of art and its meaning that is somewhat counterintuitive. *See Benthin v. Saul*, No. 1:20-cv-01014-CBK, 2021 WL 2982719, at *7 (D.S.D. July 15, 2021). Taken intuitively, "work which exists in the national economy" means work existing across the nation with no focus on a specific region or regions. But as noted, in the disability income context, however, "work which exists in the national economy" means work which exists in significant numbers either in the region where the claimant lives or in several other regions of the country. 42 U.S.C. § 423(d)(2)(A). Work which exists in the national economy is not synonymous with work in the region where the claimant lives. *Id*.

No. 21-CV-3015 CJW-MAR, 2022 WL 17548642, at *5 (N.D. Iowa Sept. 15, 2022). Similarly, in *Ell v. Kijakazi*, No. 1:21-cv-226, 2024 WL 1435320 (D.N.D. Apr. 3, 2024), the district court stated:

> The phrase "work which exists in the national economy" is a term of art that means something more specific than the ordinary understanding of that term. *See Benthin v. Saul*, No. 1:20-cv-01014-CBK, 2021 WL 2982719,

10

at *7 (D.S.D. July 15, 2021). While the "word 'national' implies that national numbers are the ones with which the SSA should be concerned," the statutory definition of the entire phrase "explains that the requirement goes further than raw national numbers" and encompasses "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A)); *see also* 20 C.F.R. §§ 404.1566(a) and (b). Work which exists in the national economy is not synonymous with work in the region where the claimant lives. *Id*.

*Id*. at *7.

In *Alice T. v. Kijakazi*, No. 8:21CV14, 2021 WL 5302141 (D. Neb. Nov. 15, 2021), the district court noted that courts within the Eighth Circuit have differed on whether work that exists nationwide satisfied the Commissioner's burden to show that work exists in significant numbers in several regions of the country. *Id*. at *16-17. For example, the district court pointed out that the "United States District Court for the District of South Dakota, relying in part on the Seventh Circuit's decision in *Barrett v. Barnhart*, 368 F.3d 691 (7th Cir. 2004), has repeatedly held that VE testimony solely concerning national job numbers for DOT occupations is insufficient to carry the Commissioner's burden at step five of the sequential analysis; there must be direct evidence of a significant number of jobs either in the claimant's 'region' or in 'several regions.'" *Id*. at *16 (collecting cases). The district court also pointed out, however, that "[b]y contrast, the United States District for the Eastern District of Missouri, relying in part on the Ninth Circuit's decision in *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528-29 (9th Cir. 2014), has taken a more pragmatic approach and held that 'evidence of jobs existing nationally *does* constitute evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to indicate that those jobs would exist only in limited numbers in isolated regions of the country.'" *Id*. at *17 (emphasis in original) (collecting cases) (quoting

11

*Hayden v. Saul*, No. 4:19-CV-187-SPM, 2020 WL 888002, at *10-12 (E.D. Mo. Feb. 24, 2020)). Ultimately, determination of work that exists in significant numbers is left "to the trial judge's common sense" and "the application of the significant numbers requirement to a particular claimant's factual situation." *Hall*, 109 F.3d at 1259. In *Shari B. v. Kijakazi*, the district court, relying on *Hall*, declined "to impose a per se rule that ALJs are required to examine whether jobs exist in the local economy, if they have identified significant numbers of jobs in the national economy"; however, "[a] regional breakdown may be necessary . . . if the number of jobs nationally is insufficiently large." No. 22-cv-1539 (DJF), 2023 WL 6130679, at *9 (D. Minn. Sept. 19, 2023).

Additionally, in *Bladow v. Apfel*, 205 F.3d 356 (8th Cir. 2000), the Eighth Circuit noted that in *Kelley v. Apfel*, 185 F.3d 1211 (11th Cir. 1999), "the Commissioner explained that, at step five of the disability determination, 'only an ability [on the part of the claimant] to do full-time work will permit the ALJ to render a decision of not disabled.'" *Bladow*, 205 F.3d at 359 (quoting *Kelley*, 185 F.3d at 1214). Further, the Eighth Circuit noted that the "Commissioner based this policy interpretation on Social Security Ruling (SSR) 96–8p, which provides that 'RFC [residual functional capacity] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. *A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.*'" *Id*. (quoting SSR 96–8p, 1996 WL 374184, at *1 (Social Security Administration, July 2, 1996)) (emphasis in original).

### 3.    *Analysis*

I start with the school bus monitor issue. The DOT provides the following job description for a school bus monitor:

> Monitors conduct of students on school bus to maintain discipline and safety: Directs loading of students on bus to prevent congestion and unsafe conditions. Rides school bus to prevent altercations between students and

damage to bus.  Participates in school bus safety drills.  May disembark from school bus at railroad crossings and clear bus across tracks.

DICOT 372.667-042, 1991 WL 673102.  Claimant argues that it is apparent from the job description that a school bus monitor is a part-time position.  While "apparent" may be a bit of overreaching, common sense suggests that a job requiring the monitoring of children on a school bus for the morning commute to and the afternoon commute from school is not an eight-hour per day, five day per week full-time job.  *See De La Cruz v. Astrue*, No. 1:08cv0782 DLB, 2009 WL 1530157, at *9 (E.D. Cal. May 28, 2009) (noting that the "ALJ indicated that the school bus monitor position was typically performed as part-time work"); SSR 96–8p, 1996 WL 374184, at *1 (Social Security Administration, July 2, 1996) ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

In *Huizar v. Astrue*, 642 F.Supp.2d 614 (W.D. Tex. June 29, 2009), the magistrate judge concluded that "substantial evidence supports the ALJ's decision that school bus monitors typically work full time, and therefore it was proper for the ALJ to consider the position at step five."  *Id*. at 622.  The district noted that the magistrate judge based her conclusion on the following: "(1) neither the description in the DOT for school bus monitor nor the VE's testimony suggest the work is performed on a part-time basis; (2) the VE testified during the hearing that light exertion work included 'standing up to six to eight hours in a workday,' described the work of school bus monitor as light exertion work according to the DOT, and opined that plaintiff would be capable of performing such work; and (3) no evidence existed to the contrary."  *Id*. at 623.  The district court found, however, that the "cited testimony regarding light exertion work was not intended to comment on whether a school bus monitor typically works a part-time job; rather, the

13

VE was merely setting the maximum parameter of exertion for each of the jobs under consideration[.]" *Id.* The district court concluded that:

> No evidence was presented suggesting that school bus monitors typically work full time. Therefore, substantial evidence does not support the ALJ's decision, and the Magistrate Judge's conclusion was clearly erroneous. On remand, the ALJ is instructed to conduct further factual development regarding whether and the extent to which the job of school bus monitor is available as a full-time position in the national and local economies.

*Id.*; *but see Lombardo v. Commissioner of Social Security*, No. 5:23-cv-686-DNF, 2024 WL 5198659, at *7 (M.D. Fla. Dec. 23, 2024) (finding *Huizar* unpersuasive and determining that claimant's assertion that school bus monitor positions are part-time without additional evidence unconvincing and concluding that substantial evidence supported the ALJ's step-five finding and the ALJ did not err in relying on the VE's testimony as to proposed jobs including school bus monitor).

In *Dipple v. Astrue*, 601 F.3d 833 (8th Cir. 2010), the Eighth Circuit addressed a claimant's argument that a VE's testimony identifying several jobs that the claimant could perform and thousands of such jobs were found in Iowa and Illinois "was insufficient because it did not specify how many of these jobs were full-time, rather than part-time." *Id.* at 836. The Eighth Circuit determined that the "vocational expert was neither required to articulate the percentage of available jobs that were part-time or full-time, nor to describe labor market conditions beyond the data that were readily available." *Id.* (citing *Liskowitz v. Astrue*, 559 F.3d 736, 745 (7th Cir. 2009)). In *Liskowitz*, the Seventh Circuit Court of Appeals explained that:

> to say that the ALJ may deny benefits only if she finds the claimant capable of some form of full-time work is quite different from saying that only full-time jobs can constitute significant work in the national economy. . . .
>
> We hold instead that a VE may . . . testify as to the numbers of jobs that a claimant can perform without specifically identifying the percentage of

14

those jobs that are part-time.  The claimant, of course, may respond to the VE's testimony by offering evidence of her own that the jobs the VE identified do not constitute "substantial gainful work" within the meaning of Section 423(d)(2)(A).  There may even be circumstances in which a claimant can accomplish this by showing that a substantial percentage of the jobs that the VE has identified are part-time jobs.  However, Liskowitz made no effort to rebut the VE's testimony in this case.  Where, as here, the VE identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the ALJ to rely on the VE's testimony.

559 F.3d at 745-46.

While a VE is not "required to articulate the percentage of available jobs that were part-time or full-time," *Dipple*, 601 F.3d at 836, and Claimant did not raise the issue of whether a school bus monitor job is generally a part-time position, here the issue is pertinent because not only did the VE offer no testimony on whether the school bus monitor position is typically full or part-time work, but the VE also offered no testimony on the number of school bus monitor, call out operator, and children's attendant jobs regionally.  The VE gave only national numbers for all three jobs.  If the identified 10,230 school bus monitor jobs available nationally are typically part-time positions, then the identified 1,977 call out operator jobs available nationally plus the 900 children's attendant jobs available nationally are insufficient for the step five determination without evidence regarding the regional numbers.  In *Karen E.*, this Court remanded the case, determining that:

Notably, here, the ALJ did not identify a regional breakdown.  In many of the cases discussed above, the national calculation was broken down into a regional calculation, the region often being the entire state.  *See Jenkins*, 861 F.2d at 1087; *Osborne*, 316 F.3d at 812; *Hall*, 109 F.3d at 1259.  This was often not done by a division of each national calculation by the 50 states but was specifically calculated for each region or several regions.  *See Osborne*, 316 F.3d at 812; *Hall*, 109 F.3d at 1259.

Here, the Court finds a regional breakdown is necessary. Although 18,000 jobs in the national economy is significant, the ALJ must ensure "jobs that exist only in very limited numbers in relatively few locations outside of the region where [claimant] lives" are not used in determining the existence of work. 20 C.F.R. § 404.1566(b) (2022). This task necessarily includes ensuring there are at least some jobs on the regional level to guarantee an isolated job is not the basis of a denial. Further, it is the practice of the ALJ and a requirement in the Eighth Circuit that the vocational expert identify the incidence of such jobs in the region where claimant resides because she is not able to perform the full range of sedentary work, as shown by the RFC conflict. *See Ellison*, 921 F.2d at 821, 822. Thus, the Court agrees the vocational expert in this case must calculate the regional occurrence of jobs in the region or several regions.

2022 WL 17548642, at *8. Similarly, in *Shari B.*, the district court determined:

In this case, the ALJ identified only a total of 18,000 jobs in the national economy and did not evaluate whether any of those jobs existed in the local or regional economies. (*See* R. 23, identifying printed circuit board taper (4,000 jobs nationally), assembler (6,000 jobs nationally), and printed circuit board screener (8,000 jobs nationally) as jobs Plaintiff could perform.) The VE noted that these were merely "representative examples" of "sedentary, unskilled jobs in the DOT in the national economy" that would fit Plaintiff's hypothetical RFC (R. 54–55), and the ALJ relied on that representation in finding Plaintiff not disabled (*see* R. 23). But there is no evidence in the record regarding any other representative occupations Plaintiff might be able to perform.

Although this is a close case, the Court finds insufficient evidence in the existing record to conclude the Commissioner has met her burden at step five. *See Karen E. v. Kijakazi*, 21-cv-3015 CJW-MAR, 2022 WL 17548642, *8 (N.D. Iowa Sept. 15, 2022) (finding 18,000 in the national economy insufficient when the ALJ did not identify any jobs at the regional level). "[T]he ALJ must ensure 'jobs that exist only in very limited numbers in relatively few locations outside the region where [claimant] lives' are not used in determining the existence of work." *Id*. (quoting 20 C.F.R. § 404.1566(b) (2022)). In this case no record exists regarding the number of jobs available in Plaintiff's region, the Commissioner has proffered no evidence regarding any other representative occupations she

might be able to perform, and the number of jobs in the national economy identified in the ALJ's opinion is borderline. The Court accordingly remands the ALJ's determination with directions to supplement the record on this issue.

2023 WL 6130679, at *9.

Here, 2,877 jobs (combined number of call out operator and children's attendant jobs) without the school bus monitor job are insufficient at step-five without the regional breakdown. *See Shari B.*, 2023 WL 6130679, at *9; *Karen E.*, 2022 WL 17548642, at *8. Moreover, even with the school bus monitor job added, 13,107 jobs are below the 18,000 jobs requiring remand for a regional breakdown in *Shari B.* and *Karen E.* Accordingly, I recommend this case be remanded for further development and VE testimony on whether the school bus monitor job is typically full or part-time and for a regional breakdown of all three jobs.

## B.    *Doyle's Opinions*

### 1.    *Parties' Arguments*

Claimant argues that the "ALJ erred by not providing sufficient reasons for finding Mr. Doyle's [functional capacity evaluation] not persuasive." (Doc. 9 at 28.) Specifically, Claimant asserts that the ALJ dismissed the supportability of Mr. Doyle's opinion based on "an imagined 'internal inconsistency.'" (*Id.* at 30.) Claimant also argues that "[c]oncerning the consistency factor, the ALJ oddly faults [Claimant] for not having various objective findings on occasion that are not fibromyalgia symptoms, and portrays that as indicative of an inconsistency with Mr. Doyle's limitations." (*Id.* at 31.)

The Commissioner argues that "substantial evidence supports the ALJ's evaluation of Mr. Doyle's opinion." (Doc. 11 at 14.) The Commissioner maintains that the ALJ "reasonably observed the various examination findings indicating greater abilities than assessed." (*Id.* at 16.) Further, the Commissioner asserts that "The ALJ also found that the opinion was not persuasive because it was inconsistent with other evidence of record

17

showing that Plaintiff typically walked normally without the use of assistive devices and generally had full strength, symmetric reflexes, and intact sensation and coordination." (*Id.* at 16-17.) The Commissioner concludes that Claimant "has failed to show that the ALJ's evaluation of the evidence was in error and merely invites the Court to re-weigh the evidence, which it may not do" and the "ALJ's findings regarding the opinion were well within the 'zone of choice' and should not be disturbed on review." (*Id.* at 17.)

### 2. *Pertinent Medical Evidence*

On January 6, 2023, Claimant met with Casey Doyle, PT, for a functional capacity evaluation. Upon testing, Mr. Doyle opined that Claimant had the ability to perform within the full range of "the sedentary physical demand category" due to "pain limitations in short distance ambulation, dynamic reaching, and active cervical mobility." (AR at 1461.) Mr. Doyle determined that "symptoms increase with any lifting, carrying, or pushing and pulling" and "would only exacerbate symptoms related to cervicalgia." (*Id.*) Mr. Doyle explained that:

> [Claimant] functions limited primarily to cervicalgia symptoms. [Claimant] presents at this time with good thoracic, lumbar, hip, knee, and ankle mobility and relatively good left shoulder mobility. Restrictions in right shoulder active function relative to cervical pain and significant limitations in active cervical ROM assessment. [Claimant] limited in walking due to arm sway and increased cervical tension with walking duration. [Claimant] is limited in sitting duration for any time greater than one hour due to continued cervicalgia symptoms. Lifting and dynamic reaching [are] limited by cervicalgia pain symptoms. Work limitations are relative to pain with static posturing and dynamic [active range of motion] of bilateral [upper extremities].

(*Id.* at 1461-62.) Mr. Doyle opined that Claimant's abilities of simple grasping, firm grasping, pinching, bending, squatting, walking, forward reaching, above shoulder reaching, and static balance were all occasional. (*Id.* at 1462.) Mr. Doyle also opined that Claimant should avoid dynamic balancing. (*Id.*)

### 3. Relevant Law

Claimant's claim was filed after March 27, 2017. Therefore, the rules articulated in 20 C.F.R. Section 404.1520c apply to analysis of this opinion. Under these rules, no medical opinion is automatically given controlling weight. 20 C.F.R. § 404.1520c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability, (2) consistency, (3) provider's relationship with the claimant, (4) specialization, and (5) other factors. *Id.* § 404.1520c(c). Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." Id. § 404.1520c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

Supportability concerns the internal consistency that a source's opinion has with the source's own findings and notes. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Consistency concerns the external consistency that the source's opinion has with the findings and opinions of other sources. "The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2).

### 4. Analysis

In considering Mr. Doyle's opinions, the ALJ determined that:

In January 2023, Casey Doyle, PT opined that the claimant has the ability to perform full range of sedentary physical demand category as defined by the DOT. However, he went on to opine that she can occasionally perform simple and firm grasping, pinching, bending, squatting, walking, forward

19

reaching, reaching above shoulder, and static balance. He opined that the claimant should avoid dynamic balance (Exhibit 27F/2-3). The undersigned is not persuaded by these findings because they are internally inconsistent. Moreover, while they are somewhat supported by the claimant's performance on the accompanying functional capacity evaluation, (Exhibit 27F), his opinion is inconsistent with other medical evidence of record. Although the claimant has been noted to use a cane at times and has reported the use of a walker, she is typically noted to ambulate normally without use of an assistive device or imbalance (Exhibits 3F/8; 10F/3; 14F/3; 17F/13; 18F/6, 9; 22F/7; 25F/17; 39F/6). She has 30° of antecollis with 10° of right lateral and 5° of right rotational torticollis affecting her right upper extremity and tender points consistent with fibromyalgia and some deficit in range of motion of her right shoulder was noted, but she otherwise has full strength, symmetric reflexes, intact sensation and coordination (Exhibits 27F; 30F/5; 39F/6; 46F/7).

(AR at 33.) Additionally, the ALJ provided a thorough discussion of Claimant's medical records which highlights the inconsistencies in the record. *See generally id*. at 22-32. I note specific findings by the ALJ pertinent to the issue of Doyle's opinions:

As of the alleged onset date, the claimant described her pain as mild and not constant. She reported that use of a TENS unit had helped a lot and that use of Aleve was helpful (Exhibits 1F/10; 2F/30). . . . X-rays of her cervical spine revealed stable degenerative disc disease at C5 and C6 interspaces with associated hypertrophic changes (Exhibits 4F/34; 8F/16). X-rays of her right shoulder were normal (Exhibits 4F/33; 8F/15).
The claimant subsequently reported substantial improvement with chiropractic treatment, dry needling, and use of Diclofenac and Gabapentin with complaints of only 1/10 pain (Exhibits 1F/15; 2F/33). In fact, she went on vacation in December 2022 and reported that she felt good upon her return. She was discharged from physical therapy the following month due to failure return or respond to attempts at contact. This evidence does not support the severity of her allegations.

The claimant subsequently reported pain in her right shoulder, which was not as severe and reported that Gabapentin had been very helpful in her sleep and had reduced her discomfort at night (Exhibit 1F/19). Inspection of her right shoulder found improvement in tenderness upon palpation to

the lateral aspect. The claimant was unable to lift her arm actively greater than 110 degrees, but she had the ability to perform internal and external rotation. She endorsed tingling and numbness into the second and third digits of her right hand, which had improved with use of gabapentin and suggested that she may have fibromyalgia after doing research on the disorder. She endorsed discomfort throughout her body (Exhibit 1F/22). Laboratory testing revealed negative ANA screen and normal rheumatoid factor (Exhibit 8F/13-14). MRI of the right shoulder was unremarkable (Exhibits (4F/13; 8F/10; 13F/111).

The following moth . . . [e]xamination of the right upper extremity was unchanged. There was left hip discomfort with palpation in the area of the trochanteric bursa, but range of motion of the hip was normal (Exhibit 1F/25). X-rays of the left hip were normal (Exhibits 4F/11; 8F/8).

During a March 2022 orthopedic evaluation, the claimant again suggested that she may have fibromyalgia. . . . Physical examination found tenderness over the left hip trochanter, but there was no pain with hip rotation and gait and station were normal without use of an assistive device. There was painful range of motion of the neck and some mild pain with strength testing, but there was normal shoulder motion and strength. Robert Bartelt, MD noted imaging results and opined that that claimant's right arm pain was likely radicular in nature. He did not affirm a diagnosis of fibromyalgia (Exhibit 3F/7-8). . . .

The claimant was referred for neurosurgical consultation with Russell Buchanan, MD where she endorsed 4/10 pain in her neck, right arm, and right thumb and index finger with numbness and tingling. . . . She denied strips, stumbles, and falls. On examination, there was no imbalance, and her station was normal. The claimant was in no distress. Cervical spine range of motion showed normal flexion, extension, lateral rotation, and lateral bending with pain. Upper and lower extremity muscle tone was normal with no abnormal movements. Bilateral upper extremity strength was normal except for 4+/5 grip and pronation strength in the right upper extremity. Strength was 5/5 in the bilateral lower extremities. Sensation was intact to light touch and symmetrical in the upper and lower extremities. Reflexes were 2+ and symmetrical throughout and Hoffman's reflexes was normal. Crossed adductor reflex was normal and there was no clonus. Dr. Buchanan noted that the claimant's symptoms were consistent with the large

21

right sided osteophyte causing nerve compression at C5-6 and recommended surgical intervention (Exhibits 6F/14-17; 10F/34-38).

In July 2022, the claimant underwent a C5-C6 anterior cervical discectomy and arthroplasty (Exhibit 13F/16). . . .

During a post-surgical visit in August 2022, the claimant reported that her neck pain was slowly improving and that her grip strength was improving[.] . . . Examination found a normal gait with no imbalance. Motor strength was 5/5 in the bilateral upper extremities and there was normal healing of the incision. Sensory examination for light touch was intact and symmetrical in the upper extremities (Exhibit 10F/3- 4). . . .

During a neurosurgical visit in late September 2022, the claimant endorsed only 2/10 neck pain, which was continuing to improve, and some tenderness in her right shoulder area. . . . She reported that she was taking only Flexeril, which was working much better than just taking Tizanidine and that her strength was improving with physical therapy. Physical examination found no imbalance of gait and no use of assistive device was noted. There was tenderness to palpation of the top of right shoulder posterior neck area. However, strength was 5/5 in the bilateral upper extremities. Sensory examination for light touch was intact and symmetrical in the upper extremities. X-rays revealed instrumentation in good position without failure. It was noted that the claimant's residual complaints were more muscle related and ultrasound at physical therapy with ongoing use of Flexeril was prescribed (Exhibit 17F/13-14). However, the claimant was discharged from physical therapy for failure to return or to respond to attempted contact, which does not lend support to the severity of her allegations (Exhibit 1F/39).

In October 2022, the claimant sought emergency treatment due to complaints of an acute onset of neck pain radiating into both arms, legs, and feet, as well as numbness and tingling radiating to her both arms into her hands. She also endorsed mild back pain and tingling to her upper thighs down to her feet and toes bilaterally. However, she denied difficulty with ambulation, loss of balance, saddle anesthesia, loss of bowel or bladder control. She reported that Gabapentin and her muscle relaxant had been working well until recently. On physical examination, there was pain with palpation over bilateral the cervical paraspinous areas, but no pain directly

22

over cervical spine and the claimant was in no distress. There was intact range of motion of the neck. Although there was pain with palpation over thoracic spine at approximately T9-11, inspection of the back was normal and there was no lumbar spine tenderness or CVA tenderness. Strength was 5/5 in all extremities. Grip strength was intact and equal bilaterally, and push/pulls were intact and equal in strength. Cranial nerves were grossly intact and there was no gait abnormality or use of assistive device noted (Exhibit 15F/2,5-6). . . .

During a pain management visit later that month, the claimant endorsed neck pain that radiated into her upper extremities and legs, as well as a tingling sensation and burning pain and weakness in her upper extremities. On examinations, she was sitting in chair and did not appear to be in acute distress. There was sustained clonus in her feet and 4/5 strength in grip of right hand, wrist flexion, and wrist extension. Triceps were 4+/5 on the left side and 4/5 on the right. There were increasing reflexes for the knees, but straight leg test was negative and inspection of the back of the neck did not reveal any signs with swelling. No gait abnormality or use of assistive device was noted. . . .

During a neurosurgical visit in October 2022, the claimant endorsed 5/10 pain. She endorsed bilateral hand numbness and tingling with burning shocking feeling that went down her arms and into her legs to numbness and tingling of her feet. However, examination found the claimant to be in no distress with 5/5 strength and intact sensation in her bilateral upper extremities. X-rays revealed instrumentation in good position without failure. It was noted that cervical MRI had shown mild myelomalacia at C5-6 and a surgical fusion at C5-6 was offered if the claimant would quit smoking. The claimant was advised to contact the provider if there were any problems, continue walking daily, continue her home exercise plan, and to return for a cotinine test if her symptoms persisted and she elected to quit smoking and pursue surgery (Exhibit 17F/6-7). However, the claimant has continued to smoke, and has not pursued the offered surgery, which does not lend support to the severity of her complaints. . . .

The claimant subsequently underwent a complete workup through Mayo Clinic, which found no basis for the bulk of her subjective complaints. During a November [2023] evaluation with Russell Gelfman, MD, the claimant endorsed 6/10 pain. She endorsed continued tingling and feelings

of numbness in both arms and both legs which was worse when she flexed her neck forward. She endorsed pain at the base of the right side of her neck and upper trapezius, as well as generalized shaking. She reported that she took Lyrica twice a day and oxycodone as needed, which was typically once in the evening, and that she used a CBD bath bomb. Examination found no atrophy or tone abnormalities. Bilateral upper and lower extremity strength was normal and symmetric. Bilateral upper and lower extremity muscle stretch reflexes were 1+ except right biceps and brachioradialis were mildly reduced. Plantar responses were down going bilaterally and [Claimant's] was negative bilaterally. There was subjective decreased pain sensitivity throughout the body including the face. Joint position sense was grossly preserved at the great toes bilaterally. Alternating motor rate in the upper lower extremities was normal. Straight leg raise was negative for radicular pain. There was tenderness to palpation, particularly over a firm nodularity near the right upper trapezius proximally and some stiffness of cervical motion, but there were no gross axial skeletal deformities. Major joints of the upper and lower extremities had functional motion. Lhermitte's reproduced arm and leg paresthesias, but spurling was negative bilaterally. There was no erythema, breakdown, or concerning lesions, and no obvious stigmata. There was no lower extremity edema. Gait and station were normal without mention of assistive device. Toe walking and heel walking were normal, and tandem gait was intact (Exhibit 18F/5-6).

Dr. Gelfman noted that despite the symptoms and abnormal signal in the spinal cord at C5-6 on imaging, the examination was not highly suggestive of a cervical myelopathy. He noted that consultation with Dr. Nassr had resulted in a recommendation of further evaluation given the subjective complaints (Exhibit 18F/5-7).

Cervical CT with myelogram revealed no substantial narrowing of the cervical spinal canal or neural foramina. There was mild ventral cord deformity to the right of midline at the C5-C6 level, similar to prior studies. There was no abnormal cervical nerve root thickening or avulsion (Exhibit 18F/20). EMG/nerve conduction studies of the bilateral upper extremities were normal. T here was no evidence suggest a right cervical radiculopathy (Exhibit 18F/17).

The claimant subsequently underwent an orthopedic evaluation with Ahmad Nassr, MD, where she endorsed right greater than left upper extremity symptoms as well as dexterity issues, and balance issues. Dr. Nassr noted that the claimant's complaints were of unclear etiology. He noted, "While there is some residual stenosis at the C5-6 segment, this is not bad enough where it should be resulting in the subjective myelopathic type symptoms that she is describing. Her exam is not consistent with this either." Dr. Nassr referred the claimant to a spine neurologist and recommended additional testing. He noted that while surgery could be performed, he was not optimistic that this would resolve all of the claimant's subjective complaints and that she was not currently a surgical candidate as she continued to smoke (Exhibit 19F/5).

Subsequent x-rays of the cervical spine revealed cervical disc replacement at C5-C6, in similar position as the prior exams. Cervical spinal alignment was normal without abnormal motion in flexion or extension (Exhibit 19F/13). EMG of the left upper extremity was normal with no evidence to suggest left cervical radiculopathy (Exhibit 19F/7-8). Somatosensory potentials were normal. There was no evidence of slowing within the central sensory pathway serving the upper and lower extremity (Exhibit 19F/19).

During a November 2022 primary care visit, the claimant reported that Lyrica was working to control her discomfort. Examination found her to have intact cranial nerves and 1-2 deep tendon reflexes in all extremities. Sensation was normal and there was normal range of motion of the spine and all joints. There was no mention of gait abnormality or use of assistive device (Exhibit 25F/22-23).

In December 2022, the claimant underwent a neurological evaluation with Patty Atkinson, MD of the Mayo Clinic, where she reported that Lyrica helped to relieve the tinging and dysesthesias and with an electric-like shock that moved through her body. Although she claimed to have fallen 4 to 5 times since her symptoms began, examination revealed no significant abnormality (Exhibit 22F/6-7).

Subsequently, Dr. Nassar's office noted, "Her workup with spine has been relatively unrevealing, with negative EMG testing and some degree of residual cervical stenosis that was not thought to be clinically significant

enough to cause myelopathic symptoms. She was not determined to be a surgical candidate at that time. She was subsequently seen by Dr. Atkinson in Spine Neurology, also with inconclusive testing to date for symptoms" (Exhibit 35F/7).

In December 2022, the claimant reported that Lyra had markedly reduced her hand tingling. Her primary care provider declined to complete disability paperwork and declined the claimant's request for medical marijuana but did refer her for dry needling and a functional capacity evaluation (Exhibit 25F/27-29). X-rays of her cervical spine revealed a disc prosthesis at C5-C6 without complication, as well as mild degenerative changes at C6-C7 (Exhibits 23F/3; 24F/2; 28F/23; 29F/8; 31F/18).

(*Id.* at 22-28.) The ALJ considered the opinions of the administrative medical providers and found their opinions persuasive. Dr. Byrnes and Dr. Vermillion concluded that "while cervical degenerative disc disease status post arthroplasty and fibromyalgia are severe impairments, no listing is met or equaled," claimant "could perform a full range of light exertion except that by duration, she could occasionally reach overhead with the right upper extremity (Exhibits 2A; 4A)." (*Id.* at 32-33.) Further, the ALJ determined that Dr. Byrnes's and Dr. Vermillion's opinions were "well supported with explanation, and they are consistent with the longitudinal record." (*Id.* at 33.) Specifically, the ALJ found that:

Despite the claimant's reportedly severe difficulty with ambulation, there is no evidence that she has been prescribed an assistive device such a walker, cane, or wheelchair. In fact, although she has been noted to use a cane at times and has reported the use of a walker, the evidence does not suggest that use of such devices is medically necessary on a sustained basis. She is typically noted to ambulate normally without use of an assistive device or imbalance (Exhibits 3F/8; 10F/3; 14F/3; 17F/13; 18F/6, 9; 22F/7; 25F/17; 39F/6). Mayo Clinic physical therapy evaluation found no significant movement limitations with transfers or transitions. Although the claimant used cane for flat surface ambulation, she moved at normal gait speed and demonstrated no apparent distress or pain with static posture (Exhibit 46F/37). Although she reported falls at one point in the record, at

26

other points she has denied falls and there is also no objective evidence that she has been treated for injury related falls due difficulty ambulating (Exhibits 6F/17; 10F/37; 22F/6). Although the claimant alleges worsening symptoms since her surgery, there is no evidence of worsening on the physical exam or MRI exams and a complete evaluation by several specialists with a thorough workup confirmed only fibromyalgia and found no evidence to support the bulk of her subjective complaints (Exhibits 36F/4-5; 39F/6; 46F/11, 14, 16; 48F/2). Since her surgery, the claimant has improved strength and improved range of motion but does have some antecollis and right rotational torticollis in her right upper extremity. Restrictions in range of motion of her right shoulder has also been noted at times. Together with her cervical surgery, supports a limitation to occasional reaching overhead and in all directions with the right upper extremity (Exhibits 27F; 39F/6; 46F/7). She also has multifactorial fatigue and has reported widespread musculoskeletal pain, which in combination with her history of cervical discectomy and arthroplasty in addition to her weight, supports a limitation to light exertion (Exhibits 13F/16; 39F/7).

(*Id.*)

Based on the foregoing, I find that the ALJ both properly considered Mr. Doyle's opinions and properly addressed the consistency and supportability of Mr. Doyle's opinions. The ALJ also properly supported the conclusions that Mr. Doyle's opinions were not consistent with the record as a whole and were not adequately supported by objective medical findings in the record. Even if different conclusions could be drawn on this issue, the conclusions of the ALJ should be upheld because they are supported by substantial evidence on the record as a whole. *See Guilliams*, 393 F.3d at 801. It is not for this Court to reweigh evidence. Accordingly, I conclude that the ALJ properly evaluated Mr. Doyle's opinions, and I recommend that the District Court affirm this part of the ALJ's decision.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **AFFIRM in part** and **REVERSE and REMAND in part** the decision of the ALJ.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to de novo review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 5th day of March, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa